[Civil No. 1325.    Filed January 2, 1914.]

[137 Pac. 555.]

## H. W. BLAISDELL, Appellant, v. ALBERT STEINFELD, HAROLD STEINFELD and F. R. PAULI, Appellees.

1. APPEAL AND ERROR—PROCEEDINGS FOR TRANSFER OF CAUSE—APPEAL BOND—FORM AND CONTENTS.—Where but one appeal was taken from the judgment and from an order denying a new trial, an appeal bond reciting that appellant gave notice of appeal in open court from such judgment and such order and conditioned in the language of Civil Code 1901, paragraph 1506, that he would prosecute his "appeal" with effect and pay the costs which had accrued in the court below or which might accrue in the appellate court was sufficient.

2. APPEAL AND ERROR — ASSIGNMENTS OF ERROR — DEFECTIVE ASSIGNMENTS—FORCE.—Under supreme court rule 8 (14 Ariz. xliii, 126 Pac. xi) providing that an objection to the ruling or action of the court

below will me deemed waived unless it has been assigned as error in the manner provided by the rules, where an assignment is so defective as to raise no question for the supreme court to decide, it is as if no assignment had been made or attempted to be made, and the objection to the trial court's ruling or action will be deemed waived.

3. APPEAL AND ERROR—ASSIGNMENTS OF ERROR—STRIKING OUT.—Where an assignment of error is so defective as to raise no question for decision, objection may be made by calling the court's attention to the defect, and no motion to strike the assignment is necessary.

4. BROKERS—REVOCATION OF AUTHORITY—EFFECT—ACTIONS—FINDINGS. In an action by plaintiff against a broker in which plaintiff attacked as usurious an agreement by him to pay a commission of ten per cent to the broker on a sale of certain property, whether made by the broker or other parties, where the trial court found that the commission was to be paid only in case the broker effected a sale, and that there had been no sale, and it was admitted in the answer that the plaintiff had revoked defendant's agency to sell, the plaintiff was entitled under the findings to a judgment for the return of collateral security for the payment of such commission, and a judgment authorizing the broker to retain such collateral as security for commissions on a future sale was erroneous, since any unilateral contract of agency to sell real or personal property may be revoked at the will of the principal.

5. JUDGMENT—CONFORMITY TO PLEADINGS—ANSWER.—In an action in which plaintiff attacked his agreement to pay defendant commissions on a sale of property whenever and by whomsoever made, as usurious, and in which the defendant's answer alleged that the consideration for such commission was services already rendered by him in his endeavor to sell and dispose of such property and his further efforts to be made by him, which efforts had been made, and prayed for a decree authorizing him to hold as security for the commission earned in regard to the sale certain collateral security, the answer did not support a judgment authorizing the defendant to hold such collateral as security for the payment of commissions on a future sale as it proceeded on the theory that the commissions were already earned.

6. BROKERS—ACTIONS—FINDINGS.—Where, in an action in which plaintiff attacked, as usurious, an agreement by him to pay defendant a commission on a sale of real property and the property of a corporation controlled by him, in which the court found that the commission was to be paid only if the defendant effected a sale, and that there had been no sale, and it was admitted that the plaintiff had revoked defendant's agency to sell, the controversy under the pleadings was as to whether the consideration for such commission was a loan of money and an extension of the time of payment of loans or the performance of services by defendant; a finding that the corporation had appointed the defendant its exclusive agent to sell its

property and had agreed to pay him a commission on any sale was outside the issues and did not support a judgment that the defendant was entitled to hold certain collateral deposited by the plaintiff as security for commissions on a future sale.

7. BROKERS — COMPENSATION — COLLATERAL SECURITY — REVOCATION OF AUTHORITY.—Where an agreement by plaintiff, owning practically all the stock and bonds of a corporation, to pay defendant a commission for selling the corporation's property was revoked before any sale thereof, an unrevoked agreement by the corporation appointing defendant its agent to sell its property, which did not pretend to pledge any of plaintiff's property as security for commissions, did not entitle defendant to hold collateral deposited by plaintiff as security for commissions on a future sale.

8. USURY — USURIOUS AGREEMENT — COMPENSATION FOR SERVICES.—An agreement between S. and B., who was indebted to S. in the sum of $25,000 and to a bank in the sum of $40,000, recited such indebtedness, B.'s desire to obtain assistance from S. to pay the indebtedness to the bank and to secure S. for the indebtedness due him, and provided, in consideration of the covenants and conditions thereinafter contained and to be kept and performed, that S. would pay the bank $20,000 and endeavor to secure from the bank an extension of six months for the payment of the balance with the option to pay the full $40,000, taking B.'s note for the amount paid the bank; that certain additional collateral security was to be furnished S.; that S. should have a commission of ten per cent on any sale of certain real estate and the property of a corporation worth from $200,000 to $250,000, regardless of who should make the sale or of any indebtedness of B. to S., or however remote the sale should be from the date of the agreement; that, if a sale was not made until after B. had discharged all his obligations to S., he should leave with S. sufficient securities to secure the payment of such commission when the sale should be made. It further provided that B. should be entitled to an extension of six months from the maturity of the several obligations due or to become due by B. to S. B.'s indebtedness to S. bore interest at the rate of ten per cent and by the agreement the notes for the amounts paid the bank by S. were to bear interest at the same rate. *Held,* that the payment of the commission was not contingent upon a sale of the properties by S., but that there was an unconditional promise to give him ten per cent of the selling price of the property whenever sold by anyone, and the consideration for the agreement to pay such commission was therefore, at least in part, a loan of money and the extension of the time of payment, and hence such agreement was usurious under Laws of 1909, chapter 84, section 1, providing that the legal rate of interest shall be six per cent, but that the parties may agree in writing to a different rate, not to exceed twelve per cent, and section 2 pro--

viding that any person so contracting for a greater rate of interest than twelve per cent shall ·forfeit all interest so contracted for in excess of twelve per cent, especially where the correspondence between B. and· S. and the answer filed by S., in an action to have such agreement declared usurious, showed that, up to the time of joining issue, S. understood that he had earned such commission, though no sale had been made.

9. USURY—"USURIOUS" AGREEMENT—ELEMENTS.—The requisites of a usurious transaction are an unlawful intent, which, however, may be inferred from the intentional doing of that which is forbidden by statute, money or money's equivalent as the subject matter, a loan or forbearance, an absolute and not a contingent agreement to repay, and an exaction for the use of the loan of something in excess of what is allowed by law, whatever its form and whether called a commission or a bonus or by some other name, and, when these elements are present, the transaction will be condemned regardless of its form.

[As to what transactions are usurious, see notes in 55 Am. Dec. 392; 81 Am. Dec. 736; 46 Am. St. Rep. 178.]

10. USURY—USURIOUS AGREEMENT.—B. was indebted to S. in a large amount and also owed a bank $20,000, and negotiations had been pending between them relative to a further loan and an extension of time of payment. S. desired that B. should transfer to him an undivided fifteen-hundredths interest in certain realty and fifteen per cent of the stock and bonds of a water and electric company and another corporation controlled by B. B. had previously agreed to pay S. a commission of ten per cent on any sale of the real estate and of the property of the water and electric company, and he urged that that agreement should be canceled, and only agreed to transfer such fifteen per cent in addition to the ten per cent after S. promised to pay the amount due the bank, taking B.'s note therefor. The attorney who prepared the papers of his own volition drew two agreements, by one of which the payment of B.'s indebtedness to S. was extended, S. agreeing to make a further loan and to pay such indebtedness due the bank, and by the other of which B. in consideration of the release of certain collateral security transferred to S. such interest in the real estate and such percentage of the stock and bonds. *Held,* that the two instruments constituted but one contract, and, B. having agreed to transfer such interest only after S. had agreed to pay the indebtedness due the bank, the consideration for such transfer was the loan of money and the extension of time of payment, and hence, as the property transferred with the interest borne by the indebtedness exceeded twelve per cent, such transfer was usurious.

11. USURY—ACTIONS—WEIGHT AND SUFFICIENCY OF EVIDENCE.—In an action in which plaintiff attacked, as usurious, the transfer by him to defendant of certain property, evidence *held* insufficient to show

that the property was transferred as a gift or that the defendant · performed any services for plaintiff except such as a large lender would naturally bestow on the business enterprises of the borrower.

12. USURY—REMEDIES—RECOVERY OF USURIOUS INTEREST.—Where usurious interest has been paid by the borrower to the lender, the excess over the rate authorized by law may be recovered, as the payments are not deemed voluntary and the debtor is not regarded as *in pari delicto.*

13. USURY — REMEDIES — CANCELLATION OF USURIOUS INSTRUMENTS.— Equity will cancel deeds and encumbrances on real property if tainted with usury or given for a usurious consideration.

APPEAL from a judgment of the Superior Court of the County of Pima. W. F. Cooper, Judge. Reversed and remanded.

### STATEMENT OF FACTS BY THE COURT.

Action by appellant to have certain contracts canceled for being usurious and to have returned to him certain securities and for moneyed judgment for interest paid under such usurious contracts. The case was tried to the court without a jury, and judgment was rendered in favor of appellees. The facts shown and admitted by the pleadings are substantially as follows:

That the plaintiff was the owner, and for some time had been such owner, of practically all the stock and bonds of the Yuma Electric and Water Company and Yuma Gas Company, of Yuma, Arizona; that for a number of years preceding July 2, 1910, plaintiff and defendant Albert Steinfeld had been intimate personal friends and had many business transactions with each other; that plaintiff had been a borrower of large sums of money from said defendant, who was a very successful business man of large financial interests; and that plaintiff reposed confidence in his business judgment and frequently sought his advice, which was freely and voluntarily given.

On July 2, 1910, the plaintiff was indebted to the Merchants' National Bank of Los Angeles, California, in the sum of $40,000, secured by $100,000 of the bonds of the Yuma Electric and Water Company, and the bank was demanding and insisting that plaintiff pay his indebtedness to it. On said date the plaintiff also owed defendant Albert Steinfeld

the sum of $25,000, evidenced by various promissory notes to secure which plaintiff had deposited with said defendant the following securities: $27,000 par value bonds of the Yuma Gas Company; also a note of Blaisdell Filtration Company for the sum of $21,000; also debenture receipt No. 66 of Imperial Water Company No. 4 for $2,680; also $20,000 par value of the capital stock of the California Development Company; also 6,300 shares King of Arizona Mining Company; and all plaintiff's equity in the $100,000 bonds of the Yuma Electric and Water Company held by the Merchants' National Bank as security for said $40,000 indebtedness to it. Defendant Albert Steinfeld on said date was likewise demanding of plaintiff that he take up and pay off his demands. On said date the plants of the Yuma Electric and Water Company and the Yuma Gas Company were inadequate to meet the demands upon them and were greatly in need of enlargement, which was then under consideration.

A few days prior to July 2, 1910, plaintiff made arrangements with the Merchants' National Bank whereby the latter agreed to accept a payment of $20,000 on account and give an extension of time on balance. For a considerable period of time prior to July 2, 1910, defendant Albert Steinfeld had been advising plaintiff to sell his various properties and had asked plaintiff to pay off his indebtedness to him. That on said date said defendant Steinfeld, possessing full knowledge of plaintiff's financial embarrassments, agreed to pay to the Merchants' National Bank $20,000 on account and to take plaintiff's note therefor, due in six months, bearing interest at ten per cent per annum, payable monthly, upon the terms and considerations as expressed in the following agreement:

"This memorandum of agreement, made and entered into this second day of July, 1910, by and between Albert Steinfeld of Tucson, Arizona, of the first part, and H. W. Blaisdell, of Los Angeles, California, of the second part:

"Whereas the party of the second part is indebted to the Merchants' National Bank of Los Angeles, California, in the sum of forty thousand dollars ($40,000) and has placed in said bank and as collateral for said loan, one hundred thousand dollars ($100,000) of the bonds of the Yuma Electric and Water Company, the same being the property of the said party of the second part; and

"Whereas, the said Blaisdell is now indebted unto the said Steinfeld, all as evidenced by the notes and obligations of said Blaisdell now in the hands of said Steinfeld; and

"Whereas, the said Blaisdell is desirous of obtaining assistance from the said Steinfeld to pay said indebtedness unto said bank, or a part thereof, and is further desirous of securing the said Steinfeld for any moneys he may now advance or loan for said purpose and is also desirous of further securing the said Steinfeld upon the indebtedness now existing and the money now owing, as well as the moneys hereafter to be owing by the said Blaisdell unto the said Steinfeld, and the said Steinfeld is willing to assist the said Blaisdell in said matters, and upon the terms and conditions hereinafter set forth:

"Now, therefore, in consideration of the sum of one dollar ($1.00), cash in hand paid unto each of the parties hereto, one unto the other, and of the covenants and conditions hereinafter contained, and to be kept and performed, it is agreed:

" (1) That the said Albert Steinfeld shall forthwith propose to the Merchants' National Bank of Los Angeles, California, to pay unto said bank the sum of ten thousand dollars ($10,000) upon the said indebtedness to said bank of the said Blaisdell, said bank to forthwith deliver unto the said Albert Steinfeld twenty-five thousand dollars ($25,000) of the said Yuma Electric and Water Company bonds, now held by said bank, and further, in the event the said Steinfeld's proposal to said bank shall be accepted that he will pay to said bank, on account of said indebtedness of said Blaisdell to said bank, and on or before four (4) months from date hereof the further sum of ten thousand dollars ($10,000) the said bank at this time, that is to say, at the time said ten thousand dollars ($10,000) shall be paid, to deliver unto the said Steinfeld an additional twenty-five thousand dollars ($25,000) of the bonds of the said Yuma Electric & Water Company; and the said Steinfeld will further propose to said bank, and as a condition for making the above payments unto said bank, that said bank shall extend the time of payment for the remaining twenty thousand dollars ($20,000) of said indebtedness unto said bank, for at least the period of six (6) months from date hereof.

" (2) The said Steinfeld shall have the right and option to pay the said Merchants' National Bank of Los Angeles, the

said remaining twenty thousand dollars ($20,000) of said indebtedness at any time on or before four (4) months from date hereof, and in such event shall obtain and have delivered unto him the remaining fifty thousand dollars ($50,000) of the bonds of the said Yuma Electric & Water Company held by said bank as aforesaid.

"(3) The said Blaisdell shall forthwith execute unto the said Steinfeld, his note in the sum of ten thousand dollars ($10,000) payable on or before six (6) months from date hereof, together with interest thereon from date, at the rate of ten (10) per cent. per annum until paid, interest payable monthly, and provisions for attorney's fees; and the said twenty-five thousand dollars ($25,000) of the bonds of the said Yuma Electric & Water Company which the said Steinfeld shall obtain from the said bank upon making the said first payment to said bank of ten thousand ($10,000) shall be held by the said Steinfeld as collateral security for the payment of said ten thousand dollar note of the said Blaisdell to said Steinfeld.

"(4) At the time the said Steinfeld shall make said second payment of ten thousand dollars ($10,000) unto said bank, as above mentioned, the said Blaisdell shall execute his note unto the said Steinfeld in the sum of ten thousand dollars ($10,000) which note shall bear interest from date at the rate of ten (10) per cent, per annum until paid, interest payable monthly, and with provision for attorney's fees, and which said note shall be due on or before six (6) months after date; and the twenty-five thousand dollars ($25,000) of Yuma Electric & Water Company bonds which the said Steinfeld shall receive from said bank upon payment of said second ten thousand dollars ($10,000) shall be held by said Steinfeld as collateral security for the payment of said last-mentioned note of the said Blaisdell to the said Steinfeld.

"(5) In the event the said Steinfeld shall elect to pay said bank the last remaining twenty thousand dollars ($20,000) of the indebtedness of the said Blaisdell to said bank, then the said Blaisdell shall at the time the said Steinfeld shall pay the same, execute his note unto the said Steinfeld in the sum of twenty thousand dollars ($20,000) together with interest thereon, from date at the rate of ten per cent. annum, interest payable monthly, and said note to be payable on or before six

months after date; and the said Steinfeld shall in the event receive and have delivered unto him the remaining fifty thousand dollars ($50,000) of the bonds of the said Yuma Electric & Water Company and which said bonds the said Steinfeld shall hold as collateral security for the payment of said note.

"(6) The said Blaisdell shall forthwith assign and transfer unto the said Steinfeld certificate of stock No. 13 for 945 shares of the capital stock of the Yuma Electric & Water Company as further security for the payment of each and all of said notes of said Blaisdell to the said Steinfeld, and as further security for any and all other indebtedness now existing or which may hereafter exist by the said Blaisdell unto the said Steinfeld.

"(7) The said Blaisdell, together with his wife, shall forthwith execute unto the said Steinfeld a good and sufficient mortgage second only to that certain mortgage executed by Hiram W. Blaisdell and Alice B. Blaisdell, his wife, on the 10th day of February, 1910, and recorded in Book 12 of Realty Mortgages, at page 145, records of Yuma county, Arizona, upon those certain premises situate in the county of Yuma, territory of Arizona, and described as follows, to wit: . . . Also any and all water rights used with or belonging to said lands or any of them. And it is provided in said mortgage indenture that the same is given as security for the payment of the hereinabove mentioned notes and for any further or other indebtedness now existing or that may hereafter exist by said Blaisdell unto the said Steinfeld.

"(8) The said Blaisdell shall assign and set over unto the said Steinfeld any and all equities which he may now have in any and all securities which the said Steinfeld now holds of the said Blaisdell, said equities to be likewise held by the said Steinfeld as collateral security for the payment of the above notes, and each and all thereof, and for any and all other or further indebtedness that may now or hereafter exist by the said Blaisdell unto the said Steinfeld. And also, the said Blaisdell shall assign unto the said Steinfeld, and as collateral security for the above notes and obligations, and all other indebtedness of the said Blaisdell to the said Steinfeld now or heretofore existing, and all rights and equities he may have in any stock of the Yuma Electric & Water Company not

herein specifically mentioned, and any and all bonds of the Yuma Electric & Water Company, and Yuma Gas Company.

"(9) That said Blaisdell shall have the right upon demand, as provided he shall have complied with each and every and all of the terms and conditions herein contained, and in any and all of said obligations contained or to be contained, to an extension of six (6) months from and after the maturity of the several obligations due, or to .become due by the said Blaisdell to the said Steinfeld, such extension or extensions to date from the maturity of each several obligation.

"(10) The said Blaisdell shall have the right to sell and dispose of the hereinabove described lands, but at a price not less than five hundred dollars ($500) per acre, and all of the proceeds of such sale or sales shall go to the said Steinfeld, and be applied upon the indebtedness of the said Blaisdell to the said Steinfeld, save and except that the sum of two hundred dollars ($200) per acre shall be applied by the said Blaisdell upon the present existing first mortgage upon said lands, to an extent sufficient to cancel the same, said mortgage being the mortgage recorded in Book 12, Realty Mortgages, at page 145, Records of Yuma county, Arizona, as aforesaid.

"(11) The said Blaisdell shall have the right to sell any or all of the said Yuma Electric & Water Company bonds held by the said Steinfeld at a price of not less than eighty cents on the dollar, all of the proceeds of said sale or sales to be paid to said Steinfeld to the extent of the total obligation of the said Blaisdell to the said Steinfeld.

"(12) In the event the said Steinfeld shall not elect to pay to the Merchants' National Bank of Los Angeles, California, the last twenty thousand dollars of the forty thousand dollar indebtedness of said Blaisdell to said bank, heretofore referred to, and within four (4) months from date hereof, the said Steinfeld will at the request of the said Blaisdell, release said bank from holding for said Steinfeld the last fifty thousand dollars ($50,000) of bonds held by said bank, of the Yuma Electric & Water Company, and in which event further, the said bonds shall be considered subject only to the claim of said bank, as collateral and security for any and all indebtedness of the said Blaisdell to the said Steinfeld, provided, however, that the said Blaisdell shall have the right to sell said bonds at a price of not less than eighty cents on the dollar

and shall apply the proceeds thereof, or so much thereof as may be necessary, to the whole indebtedness owing said Steinfeld and whether the same shall be due or not, and a lien is hereby granted said Steinfeld upon said bonds, subject only to the claim of said bank. Should the said Blaisdell find it necessary to sell and dispose of certain of said last fifty thousand dollars of bonds of said Yuma Electric & Water Company, to satisfy and discharge the last twenty thousand dollars due unto the said Merchants' National Bank of Los Ángeles, then, and in that event he shall have the right to sell a sufficient number of said bonds at not less than eighty cents on the dollar, to satisfy and discharge said indebtedness, and shall not be required to pay the moneys so applied, unto the said Steinfeld.

"(13) In the event the properties of the Yuma Electric & Water Company shall at any time be sold or disposed of, or the said land hereinbefore referred to, there shall be paid as a commission upon the sale of said lands, unto said Steinfeld, ten per cent. upon the amount received therefor, and the sale shall be made through said Steinfeld, and the commission paid unto him, and the said commission shall be paid upon the sale of said properties in any form, that is to say, the commission shall be paid if the bonds or stock of said company shall be sold, or if the properties of said company shall be sold, and said commission shall be paid said Steinfeld regardless of who shall make or negotiate said sale and shall be paid at the time of said sale and further, said commissions shall be paid regardless of any indebtedness of the said Blaisdell unto the said Steinfeld, and said commission shall be paid whenever the said sale or sales may take place, however remote from this date.

"(14) The said Steinfeld shall have the right to have free access to all the books and records of said Yuma Electric & Water Company and to ask for and receive statements and reports of the operation of the company; to employ at the expense of said company an additional mechanical engineer; and may take such steps as he may deem proper for the better and more successful operation of said plant, and the protection of said Steinfeld, until any and all indebtedness of the said Blaisdell unto the said Steinfeld shall have been discharged.

"(15) The said Blaisdell shall have the right, and permission is hereby given unto him, to clip from the bonds of the Yuma Electric & Water Company and Yuma Gas Company, which he shall deliver or cause to be delivered, or which may be delivered to the said Steinfeld all interest coupons now due or past due.

"(16) All collateral and security given and to be given by the said Blaisdell hereunder, shall be security for all indebtedness of the said Blaisdell to the said Steinfeld whether now existing or hereafter existing, and for all advances that the said Steinfeld may make for his security, the same to be made in his uncontrolled discretion; and further, any and all advances the said Steinfeld shall make shall bear interest from date they were made at the rate of ten per cent. per annum until paid, said interest to be paid monthly.

"(17) It is expressly agreed, anything herein to the contrary notwithstanding, and the same shall be incorporated in any and all notes and obligations which the said Blaisdell shall execute unto the said Steinfeld for any and all indebtedness, that in case default be made in any one note or obligation, or any covenant or agreement herein or therein contained be not fully kept and performed by the said Blaisdell, that each, all and every note and obligation then existing between the said Steinfeld and the said Blaisdell shall at once become wholly due and payable; and should it be that a note or obligation shall not contain this clause, or one of like tenor and effect, nevertheless the same shall be deemed incorporated in each and all of said notes and obligations.

"(18) The said Steinfeld shall have the right, and it is hereby granted him, in case default shall be made by said Blaisdell in any covenant herein contained, or in any agreement or covenant in any of said obligations now or hereafter to be executed, to sell any part or the whole of the property in his hands as security or collateral, and to sell the same at public or private sale, after giving twenty (20) days' notice thereof, and such sale shall be at such place and upon such terms as to the said Steinfeld may be satisfactory, and the proceeds of such sale or sales shall be applied by the said Steinfeld to the indebtedness of the said Blaisdell to him, and the costs of such sale or sales, and the surplus, if any, and

after the deduction of all proper costs and charges, shall be paid unto the said Blaisdell.

"(19) Whenever it shall be necessary in law for any company or corporation to consent in order to bind said corporation to the terms of this agreement, to make the same effective and binding upon such company or corporation, the said Blaisdell shall cause action to be taken' and in due and proper form, and as soon as it may be done, to the end that said corporation shall agree to each and every covenant herein, so far as to said corporation these presents may appertain.

"(20) From time to time and as the said Blaisdell may discharge his obligations unto the said Steinfeld there shall be released and delivered unto the said Blaisdell of the securities held by said Steinfeld such amount as shall be mutually agreed by the parties hereto.

"(21) It is expressly and again set forth, that any and all securities now held by the said Steinfeld of the said Blaisdell, and all further and additional securities which the said Steinfeld shall hereafter and hereunder obtain from the said Blaisdell, or on his account, shall be held by the said Steinfeld as collateral and as security for any and all indebtedness of the said Blaisdell to the said Steinfeld, whether now or hereafter existing, and that the whole of said securities may be retained by the said Steinfeld until the indebtedness shall have been discharged, except such securities as may be released by mutual consent as provided in the last preceding paragraph.

"(22) And further, and in the event the sale of the properties hereinabove mentioned shall not be made until after the said Blaisdell shall have discharged all of his obligations unto the said Steinfeld, that then and in that event, there shall be left with the said Steinfeld, by the said Blaisdell, sufficient securities as shall secure the payment of said commission unto the said Steinfeld, when the sale or sales shall be made.''

Pursuant to this agreement plaintiff executed his notes for $25,000 to defendant Albert Steinfeld, covering the $25,000 already owing Steinfeld and the $20,000 to be paid the Merchants' National Bank, and the latter paid the Merchants' National Bank $20,000 and received from the bank $50,000 par value bonds of the Yuma Electric and Water Company, and mortgage mentioned in agreement was made out by plaintiff and wife to Steinfeld. On or about July 2, 1910, it was

agreed between plaintiff and defendant Albert Steinfeld that the Yuma properties should be offered for sale for the sum of $200,000, and defendant Albert Steinfeld endeavored to sell said property at such price. That plaintiff did and performed on his part everything required to be done and performed by him under the terms of the contract of July 2, 1910.

Negotiations beginning in December, 1910, and brought to conclusion January 19, 1911, between plaintiff and defendant Albert Steinfeld, resulted in the following instrument being executed:                    :

"This memorandum of agreement, made and entered into this 19th day of January, 1911, by and between Albert Steinfeld, of Tucson, Arizona, of the first part, and H. W. Blaisdell, of Los· Angeles, state of California, of the second part:

"Whereas, the parties hereto did on the 2d day of July, 1910, enter into a certain agreement, and which agreement is now in full force and effect; and

"Whereas, the parties hereto are desirous of contracting further in the premises:

"Now, therefore, in consideration of the sum of one dollar, cash in hand paid unto each of the parties hereto, one unto the other, and of the covenants and conditions hereinafter contained, and to be kept and performed, it is agreed:

"(1) That the time of payment of each, all and every of the notes, debts and obligations of the party of the second part unto the party of the first part, and mentioned and described, set forth and included in said agreement of date July 2, 1910, is hereby extended for the period of twenty-four (24) months from and after January 1, 1911, and so that each, all and every of said notes, debts and obligations of the party of the second part to the party of the first part, mentioned and described, set forth and included in said agreement of date July 2, 1910, shall become and be payable January 1, 1913, provided, however, and nothing herein contained shall in any manner change, limit or prevent the maturing and becoming due and payable and collectable of any of said notes, debts, and obligations, at any time by reason of fail ure on the part of the party of the second part to keep and perform each and all of the obligations contained in said agreement of July 2, 1910, or in any of said notes or obligations; it being the intention of the parties hereto merely to

extend the time of payment of the principal of said notes, debts, and obligations, and to in no manner change the terms or conditions thereof or of said agreement of July 2, 1910; and the said agreement of date July 2, 1910, shall continue in each, all and every of its parts, covenants, terms and conditions, in full force and effect, save only as to the one matter of the extension of the time of the payment of the principal of the said notes, debts and obligations.

" (2) The party of the first part shall loan to the party of the second part the sum of seven thousand five hundred dollars ($7,500) and the party of the second part shall forthwith loan in turn, said sum of seven thousand five hundred dollars ($7,500), and an additional sum of seven thousand five hundred dollars ($7,500) which he shall himself forthwith advance unto the Yuma Electric & Water Company, and the whole of said money, that is to say, the sum of fifteen thousand dollars ($15,000) shall be loaned by the said party of the second part unto said company, and at the rate of ten per cent. (10%) per annum interest, said interest payable monthly, and said total loan of fifteen thousand dollars ($15,000) shall be repaid unto the said party of the second part by said Yuma Electric & Water Company from time to time from the net earnings of the company. Said money shall be used and expended by said Yuma Electric & Water Company for certain machinery, and the betterment of its property situate at Yuma, Arizona. The said Blaisdell upon payment of said sum of seven thousand five hundred dollars ($7,500) by the said party of the first part to him shall execute and deliver his personal note for the sum of seven thousand five hundred dollars ($7,500), payable on or before two years from and after January 1, 1911, and said note shall bear interest from date at the rate of ten per cent. per annum until paid, and said interest shall be payable monthly, and principal and interest shall be payable at the Consolidated National Bank of Tucson, at Tucson, Arizona; and said note shall contain a clause that if said interest be not paid as therein provided, the principal sum of said note may at the option of the said party of the first part, or the holder of said note, become due and payable, and shall contain a further clause that in case said note is placed in the hands of an attorney for collection a reasonable attorney's fee shall be

allowed; and said note immediately upon its execution and delivery by the said party of the second part unto the said party of the first part, shall be deemed to be included in and covered by each and all of the terms and covenants and conditions of the said contract between the parties hereto of date July 2, 1910, and all securities mentioned in said contract and held by the party of the first part as security or collateral, shall also be held as security and collateral for the payment of said note for $7,500.00, and also, all terms, conditions and covenants in said contract shall fully apply to said note and the said note shall be deemed to be included in said contract as fully and to the same extent. (and all collateral and securities mentioned in said contract shall be further held as collateral and security for the payment of said note) as if this particular indebtedness as evidenced by said note for $7,500.00 were set especially and in full in said contract.

"(3) The said party of the second part, as the owner of the bonds and stock of the said Yuma Electric & Water Company, and in control of said corporation, and familiar with its affairs does represent and covenant, and as a part of the condition of these presents, that the amount due and collectable from the sale of water, light, gas and supplies prior to January 1, 1911, will pay all outstanding obligations of said Yuma Electric & Water Company on January 1, 1911, except those obligations incurred and to be incurred in the betterment of the plant, the construction and execution of which betterment are to be made subsequent to January 1, 1911, excepting, however, from this covenant the bonded indebtedness of said corporation; and said party of the second part agrees that said Yuma Electric & Water Company shall not become indebted in any sum greater than the sum of $2,000.00 at any time, except for the regular operating expenses which are to be paid monthly as the water, light, and gas accounts are collected, excepting always the said bonded indebtedness; and that the said Blaisdell shall receive no salary as an officer of said company.

"(4) The party of the first part will on demand of the Merchants' National Bank of Los Angeles, California, pay unto said bank a certain indebtedness of the said party of the second part unto said bank in the sum of twenty thousand dollars ($20,000), and in the event of said demand and payment,

the said party of the first part shall be entitled to and shall receive from said Merchants' National Bank of Los Angeles, a certain fifty thousand dollars of the bonds of the Yuma Electric & Water Company, said bonds being the property of the said party of the second part and being now in the hands and possession of said Merchants' Bank of Los Angeles as security and as collateral for the payment of the aforesaid indebtedness in the amount of $20,000.00 of the said party of the second part unto said bank, and the said party of the second part in the event of such demand and payment, shall authorize and instruct said bank at the time such payment shall be made of said sum of $20,000.00 to deliver said fifty thousand dollars of bonds of the Yuma Electric & Water Company unto the said party of the first part; and the said party of the second part shall immediately upon payment of said sum of $20,000.00 by the said party of the first part unto said bank, execute his promissory note unto the said party of the first part and of date the date of payment of said indebtedness and in the sum of $20,000.00, and which said note shall be payable on or before the 1st day of January, 1913, and which said note shall bear interest from date at the rate of ten per cent. (10%) per annum until paid, interest payable monthly, and interest and principal payable at the Consolidated National Bank of Tucson, at Tucson, Arizona, and with the provision that if said interest is not paid at maturity the owner or holder of said note may declare the principal thereof wholly due and payable, and with the provision in said note further, for attorney's fees; and immediately upon the payment of said sum of $20,000.00 by the said party of the first part unto said bank of the said indebtedness of the said party of the second part unto the said bank, the said bonds of said Yuma Electric & Water Company in the sum of fifty thousand dollars, and now held by said Merchants' National Bank of Los Angeles, shall be security and collateral for the said money so paid by the said party of the first part, and security for the payment of the said note in the sum of $20,000.00 to be executed by the party of the second part unto the party of the first part, and shall also be security and collateral for all other debts and obligations whatsoever of the said party of the second part to the said party of the first part, and whether now owing or not, and whether mentioned

herein or not; and further, the said party of the first part shall have the right at any time whatsoever from and after this date, and at his option, to pay unto the said Merchants' National Bank of Los Angeles, the said $20,000.00 of indebtedness of the said party of the second part unto said bank, and to obtain and receive from said bank the evidence of said indebtedness and the said fifty thousand dollars of bonds of the said Yuma Electric & Water Company, and to hold said bonds as security and collateral for said payment, and as security and collateral for all other indebtedness whatsoever of the said party of the second part unto the said party of the first part whether now or then owing, and the said party of the second part, in the event said party of the first part should voluntarily make such payment unto said bank, shall upon request of said party of the first part instruct said bank to accept said payment of said indebtedness and to deliver the evidence thereof, and the said bonds, unto the said party of the first part; and further the said party of the second part shall immediately upon said payment unto the said bank by the said party of the first part, execute his said note in the said sum of $20,000.00 unto the said party of the first part, payable on or before January 1, 1913, with interest at the rate of ten per cent. (10%) per annum from date until paid, interest payable monthly, and said principal and interest payable at the place, and said note to contain all of the terms, conditions and covenants, all as in the note hereinabove provided to be executed in the event the said bank should demand payment of said indebtedness; and said note so executed, shall be secured by said bonds, and said bonds shall be held as collateral therefor, and for all other indebtedness whatsoever of the said party of the second part unto the said party of the first part.''

Also the following instrument:

''In consideration of the delivery to me this day, by Albert Steinfeld, of Tucson, Arizona, and free and clear of all liens, claims and encumbrances, the following property, that is to say: Debenture receipt No. 66 for bonds of Imperial Water Company in the amount of $2,680.00; note, Blaisdell Filtration Company, of date November 15, 1915, payable to the order of Blaisdell Company, in the sum of $21,000.00, together with guaranty of payment of said note by Blaisdell Company

and H. W. Blaisdell; six thousand three hundred (6,300) shares of the King of Arizona Company, as evidenced by certificate No. 56; one hundred (100) shares of California Development Company, as evidenced by certificate No. 516; two hundred (200) shares of California Development Company, as evidenced by certificate No. 214—I agree to and do by these presents hereby sell, assign and transfer unto the said Albert Steinfeld the following property, that is to say: Fifteen thousand dollars ($15,000.00) at par of the bonds of the Yuma Electric & Water Company, and being bonds numbered one to fifteen, both inclusive. . . . And I agree to forthwith deliver the same unto the said Albert Steinfeld. Eight thousand dollars of the bonds of Yuma Gas Company, and being bonds numbered 22, 23, 24, 25, 26, 44, 45, and 46. . . . And I agree to forthwith deliver the same unto the said Albert Steinfeld. One hundred fifty shares of the capital stock of the Yuma Electric & Water Company. And I agree to forthwith deliver the same unto the said Albert Steinfeld. This is a sale absolute of said described property. And further I do agree to forthwith grant, bargain, sell and convey unto the said Albert Steinfeld, or to such person as he may nominate, an undivided fifteen one-hundredths (15/100) interest in and to those certain premises situate in the county of Yuma, territory of Arizona, and described as follows to wit: . . ."

That said instruments were drawn at the same time and place and were executed on the same day, and that plaintiff did and caused to be done all the things therein agreed to be done by him. Steinfeld did not pay to Merchants' National Bank the balance of $20,000 mentioned in agreement. That on or about November 7, 1912, plaintiff paid defendant Albert Steinfeld the sum of $53,000, being all the interest and principal of all notes of his held by said Steinfeld, and demanded the return of his securities. That said Steinfeld, claiming to be the owner thereof, refused to return the following property: $15,000 par value of the bonds of the Yuma Electric and Water Company; $8,000 par value of the bonds of the Yuma Gas Company; and 150 shares of the capital stock of the Yuma Electric and Water Company and fifteen hundredths of the lands described—and refused to return $10,000 par value of the bonds of the Yuma Electric and Water Company and $4,000 par value of Yuma Gas Com-

pany bonds, claiming the right to hold them as security for commissions upon the sale of the property or properties of the Yuma Electric and Water Company in pursuance of the contract dated July 2, 1910, and for services rendered by Steinfeld in trying to sell said properties. That on or about November 8, 1912, and before the bringing of this suit, plaintiff notified defendant Albert Steinfeld that the contracts of dates July 2, 1910, and January 19, 1911, were rescinded.

The controverted facts in the pleadings are: The plaintiff alleges that he was greatly in debt, owing something like $100,000, and that his creditors, the Merchants' National Bank and Steinfeld, were pressing him to pay, threatening suits to enforce payments. That defendant Albert Steinfeld knew plaintiff's financial condition, his financial embarrassments and necessities, and his imperative need of raising and procuring money and took advantage of plaintiff's helpless financial condition, and therefore exacted and received, in addition to ten per cent interest on loans made and extensions, the agreement in contract dated July 2, 1910, to pay ten per cent commission on the sale of his property and the agreement in contract of January 19, 1911, that Steinfeld should have fifteen per cent of his property in addition to ten per cent interest on loans. That said agreements were exacted and demanded in addition to paying ten per cent interest on loans as a bonus for making loans and for extension of time on loans. That said contracts were unconscionable and extortionate and were obtained by duress and threats. Plaintiff alleges that the return to him of the Imperial Water Company debenture receipt No. 66 for $2,680, the note of Blaisdell Filtration Company for $21,000, 6,300 shares of King of Arizona Company, 300 shares of California Development Company, the recited consideration for fifteen per cent of stock and bonds, and fifteen hundredths of lands was not the real consideration for such contract but was for the purpose of evading usury laws of Arizona and for covering up violations thereof.

The defendants specifically deny all the above allegations, and with respect to the commission contract of July 2, 1910, admit and allege: "Defendants admit that the ten per cent commission mentioned in the contract of July 2, 1910, was to be paid as in said contract set forth (that is to say, it was to

be paid to the said Steinfeld regardless of by whom the sale might be made, and regardless of whether at the time of the sale the said plaintiff should be indebted to the said Steinfeld), and in this behalf aver, as aforesaid, that the consideration of said commission was service already rendered by the said Steinfeld in an endeavor to sell and dispose of the said property, and of further efforts to be made by the said Steinfeld to sell and dispose of said properties, and which efforts have been made at great expense of time and some money to the said Steinfeld, and that said commissions were to be paid as compensation for said services so rendered and to be rendered, and that said commission as set forth in said contract was to be paid regardless of any indebtedness (that is to say, that said commission had naught whatsoever to do with said indebtedness but was entirely independent thereof and was for services rendered and to be rendered as aforesaid), and also that certain clauses in said contract of July 2, 1910, in regard to the payment of said commission were inserted therein for the purposes of avoiding any difficulties that might arise in the collection of said commission and as to whom or what persons had actually effected the same.''

With respect to the agreement of January 19, 1911, the defendants allege: ''Defendants allege that the sole and only consideration moving to the said Steinfeld for the extension of time on the obligations of said plaintiff to said Steinfeld, and the agreement to take up the indebtedness of said Blaisdell to said Merchants' National Bank, was the interest at ten per cent per annum upon said moneys, and that the only true consideration in regard to the transfer of said fifteen per cent of said stocks, bonds, and said lands was the aid, services, and assistance of said Steinfeld, sought by said Blaisdell; that said Steinfeld has rendered said services; and that said services have been and are of great value unto the said plaintiff Blaisdell.'' Also: ''That the said plaintiff, voluntarily and prior to the execution of said contract of January, 1911, asked the defendant Steinfeld to join in his enterprises and offered to give him absolutely fifteen per cent of the bonds of said Yuma Electric and Water Company, being $15,000 par value of said bonds, and $7,500 of the bonds of the said Yuma Gas Company and 150 shares of the capital stock of the said Yuma Electric and Water Company,

and an undivided fifteen-hundredths interest in and to certain lands in the county of Yuma, and being the lands set forth and described in plaintiff's complaint herein; the said plaintiff requiring the said defendant Steinfeld, in consideration of the transfer and conveyance of said property, to interest himself personally in plaintiff's enterprises and to assist in the improvements and betterment thereof. . . . ''

The plaintiff alleges that the value of stock and bonds was $250,000 and of land was $25,000. Defendants deny such value, but admit stock and bonds were of a value of $125,000 and land $20,000.

Defendants ask that Albert Steinfeld be decreed the owner of $15,000 par value of bonds of the Yuma Electric and Water Company now in his possession, of $8,000 par value of the bonds of the Yuma Gas Company now in his possession, of 150 shares of the capital stock of the Yuma Electric and Water Company now in his possession in the name of the defendant Pauli, and fifteen-hundredths interest in the real estate, title to which is in Harold Steinfeld as trustee of Albert Steinfeld; that it be decreed that Albert Steinfeld shall hold, as security for the payment of commission earned in regard to the sale of real estate, $10,000 par value of the bonds of the Yuma Electric and Water Company now in his possession and $4,000 par value of the bonds of the Yuma Gas Company now in his possession, all as provided in paragraphs 13 and 22, contract of July 2, 1910.

The findings of fact, in brief, were: That plaintiff and defendant Albert Steinfeld executed the contract of July 2, 1910; that it was not the intent or purpose of either plaintiff or defendant that defendant should receive any commission or compensation by reason of any sale of said property that might be effected or procured without the services of defendant, but that defendant should be the sole judge as to whether any sale that might be effected was as a matter of fact procured by the defendant; that the bonds assigned to defendant in said contract were given by plaintiff as security for any commission to which defendant might become entitled under said contract; that defendant endeavored to sell properties under the terms of contract of July 2, 1910, and that no sale had been effected or procured by him at the date of this action; that the Yuma Electric and Water Com-

pany did, pursuant to the agreement of July 2, 1910, appoint
defendant its sole and exclusive agent for the sale of its prop-
erties and agreed to pay ten per cent commission, and that
said contract of agency has not been revoked or in any wise
canceled by the Yuma Electric and Water Company and is
still in full force and effect; that under said contract of July
2, 1910, defendant was given the right to hold plaintiff's
securities to secure the payment of commissions that might
be earned by Steinfeld; that said contract for commission was
independent of and disconnected with the contract for the
loan of money or extension of time of payment of obliga-
tions, and that the sole and exclusive consideration for com-
missions to be paid defendant was his services to be performed
in procuring the sale; that the loan of money or extension of
time on loans was no part of the consideration for the agree-
ment to pay commissions; that said commission was not a
bonus for a loan or extension of time of payment but was a
commission on sale of property, payable only when property
was sold, and then only in the event that defendant directly
or indirectly had accomplished the sale; that the contract
of July 2, 1910, was not usurious, nor unconscionable, nor
extortionate.

The plaintiff and defendant Albert Steinfeld executed the
contract of January 19, 1911; that prior thereto, in Decem-
ber, 1910, plaintiff and defendant entered into a verbal con-
tract by the terms of which it was provided that defendant
become interested with plaintiff in plaintiff's enterprises at
Yuma, and that said plaintiff freely, and without collusion,
duress, or compulsion of any kind, and for such considera-
tion, agreed to give, of his own voluntary offer, fifteen per
cent of the stock and bonds of the Yuma Electric and Water
Company and fifteen per cent of the bonds of the Yuma Gas
Company and fifteen per cent of certain lands described in
complaint; that on or about said date plaintiff borrowed
from defendant $7,500; that the real, true, and only consid-
eration for the transfer of the said fifteen per cent of bonds,
stock, and lands, as set forth in said contract of January 19,
1911, was the services of defendant to be rendered plaintiff,
and that the consideration therefor was not the loaning of
money or forbearance on money lent or extension of time;
that defendant did thereafter render the service agreed on;

XV Ariz.—12

that there was no usury in either of said contracts of July 2, 1910, or January 19, 1911, nor intent on the part of plaintiff to pay, nor on the part of defendant to receive, any interest in excess of ten per cent per annum; and that said contracts were fair and conscionable and equitable, and for the mutual benefit of the plaintiff and defendant, and that no advantage was taken of the plaintiff by defendant in the procurement of either of the said contracts, and that such contracts were the voluntary acts of both plaintiff and defendant.

Judgment was entered for defendants as prayed, except that it was provided that plaintiff could apply to the court for an adjudication that a reasonable time for the sale of the property by Steinfeld, as provided in July contract, had elapsed, or to declare the agency for said sale of properties at an end, and should the court be satisfied that no sale had been made, or that agency has been terminated, it would then order the return of said $10,000 par value of Yuma Electric and Water Company bonds and $4,000 par value of Yuma Gas Company bonds to Blaisdell.

Other and additional facts are set forth in the opinion of the court.

Mr. Selim M. Franklin, Mr. Frank C. Hill and Mr. Geo. S. Hupp, for Appellant.

Mr. Eugene S. Ives, Mr. Gerald Jones and Mr. S. L. Kingan, for Appellees.

ROSS, J.—Appellees, by a motion to dismiss, have attacked the sufficiency of the appeal bond. It is said the bond recites the judgment and order denying the motion for a new trial, but its condition is merely that appellant will pay all costs that might accrue on the "appeal," and it is therefore void.

The bond recites a judgment against appellant, a motion for new trial, and an order overruling the motion, and proceeds: "And the said H. W. Blaisdell did then and there, and on said day in open court, give notice of appeal to the supreme court of the state of Arizona from the said judgment and from the said order denying his motion for a new trial aforesaid; and whereas the clerk of said superior court has fixed the probable amount of the costs of said suit of both

the appellate court and the court below at the sum of two hundred and fifty dollars ($250.00), and the said H. W. Blaisdell desires to perfect his said appeal by filing a bond as required by law: Now, therefore, if the said H. W. Blaisdell, appellant, the principal herein, shall prosecute his appeal with effect, and shall pay all costs which have accrued in the court below, or which may accrue in the appellate court. . . . ''

It will be observed that the bond recites but one notice of appeal, and that notice of appeal was from the judgment and order denying motion for new trial. The bond is as provided by paragraph 1506, Revised Statutes of 1901, ''conditioned that such appellant . . . shall prosecute his appeal . . . with effect, and shall pay all costs which have accrued in the court below, or which may accrue in the appellate court.'' It is contended by appellant that according to paragraph 1493, Revised Statutes of 1901, which provides that an appeal may be taken from any final judgment and from any of the orders mentioned in section 1214, there is but one appeal. Whether he is right in this contention or not we do not think necessary to decide, as we are satisfied that there is but one appeal in this case. In jurisdictions where the appeal from the judgment and order refusing a new trial are treated as separate appeals, one bond conditioned as the bond in this case has been held sufficient. *Bell* v. *Staacke,* 159 Cal. 193, 115 Pac. 221; *Granger* v. *Robinson,* 114 Cal. 631, 46 Pac. 604; *Pirrie* v. *Moule,* 33 Mont. 1, 81 Pac. 390.

We do not think the case of *Dean* v. *Territory,* 13 Ariz. 152, 108 Pac. 476, relied upon by appellees, is in point. In that case the bond recited three separate appeals and contained a single obligation.

Appellees have also filed a motion to strike certain of appellant's assignments of error, alleging their insufficiency. The practice of striking assignments that fail to conform with the rules of the court or with law has never been recognized by this court. According to rule 8 of the rules of this court (14 Ariz. xliii, 126 Pac. xi), ''an objection to the ruling or action of the court below will be deemed waived in this court, unless it has been assigned as error, in the manner'' provided by the rules. An assignment so defective as to raise no question for this court to decide is as if no assignment had been

made or attempted to be made, and any objection to the ruling or action of the trial court thus made "will be deemed waived." No motion to strike is necessary, but objection may be made by calling the attention of the court to the defective assignment.

The appellant makes eight assignments of error, three of which are unquestionably good, and, as they present all the questions we are asked to pass upon, it is unnecessary for us to refer to or discuss the others. The assignments that we shall consider are:

· (1) "That the findings of fact do not sustain the judgment in this: That, as the court found that the ten per cent commission was only to be paid Steinfeld in the event he himself made a sale, there was no consideration whatsoever for this agreement, Steinfeld not having made any sale; and as it was alleged in the complaint, and admitted in the answer, that Blaisdell, before commencing this suit, had notified Steinfeld that he rescinded his (Steinfeld's) right to sell, the court should have adjudged and decreed that the contract of July 2, 1910, was canceled, and should have ordered Steinfeld to return to Blaisdell the $10,000 of Yuma Electric and Water Company bonds and $4,000 of Yuma gas bonds to Blaisdell, without any terms or conditions whatsoever. The court erred in rendering its judgment requiring Blaisdell to make new proof or rescission of the commission agreement and in fixing terms as set forth in the judgment."

(2) "The court erred in not finding, from the evidence, that the contract to pay Steinfeld a commission of ten per cent upon the sale of Blaisdell's properties was usurious and void."

(3) "The court erred in not finding, from the evidence, that the consideration to Blaisdell for the fifteen per cent of the bonds, stock, and real property that he transferred to Steinfeld, was a usurious consideration and therefore void, and further erred in not finding said contract unconscionable."

1. Under the findings as well as the claim of right to hold the $10,000 par value of bonds of Yuma Electric and Water Company and $4,000 par value of bonds of Yuma Gas Company as set forth in defendants' answer, the appellant was entitled to a judgment directing their return to him. The findings are to the effect that Steinfeld was to have ten per

cent commission only in case he effected a sale of the properties, and that there had been no sale. That Steinfeld's contract of agency to sell had been revoked before the institution of suit was admitted in the answer. These bonds were placed with Steinfeld to secure the payment of the ten per cent commission in case he earned the commission, and that could only be by his effecting a sale of the property.

"Nothing is better settled in the law than that an authority to sell land, when not coupled with an interest, may be revoked at the will of the principal." *Kolb* v. *Bennett Land Co.*, 74 Miss. 567, 21 South. 233; *Jayne* v. *Drake* (Miss.), 41 South. 372; *Simpson* v. *Carson*, 11 Or. 361, 8 Pac. 325; *John L. Rowan & Co.* v. *Hull*, 55 W. Va. 335, 104 Am. St. Rep. 998, 2 Ann. Cas. 884, 47 S. E. 92. Any unilateral contract of agency, whether it be to sell personalty or realty, may be revoked at the will of the principal.

Further, defendants' answer precludes their right to hold said bonds as security for a possible future sale. The answer says: "That the consideration of said commission was service already rendered by said Steinfeld in his endeavor to sell and dispose of said property, and of further efforts to be made by said Steinfeld to sell and dispose of said properties, and which efforts have been made at great expense of time and money. . . . " The prayer to the answer is: "That it be decreed that Albert Steinfeld shall hold as security for the payment of commission earned in regard to the sale of real estate. . . . " The answer was drafted on the theory that appellant had canceled and rescinded Steinfeld's agency and authority further to act in the matter of selling the properties of appellant. Nor does the fact that Steinfeld had been appointed by the Yuma Electric and Water Company its "sole and exclusive agent" for the purpose of selling its property, with the agreement on its part to pay him ten per cent commission on any sale, aid the judgment, for the reason that such agreement was outside the issues made by the pleadings, and further did not pretend to pledge appellant's bonds or any other bonds or property as security for commissions he might earn under his agreement with the company. The judgment should have decreed the appellant the owner of said bonds, free from any claim of lien, and directed their return to the appellant.

2. This assignment makes the proposition that the court erred in not finding from the evidence that the contract to pay Steinfeld a commission of ten per cent upon the sale of appellant's properties was usurious and void. It is the contention of appellant that by the terms of the contract of July 2, 1910, itself, and the undisputed evidence in the case, the only consideration to appellant for this agreement to pay appellee Albert Steinfeld a commission of ten per cent when his property was sold, was Steinfeld's agreement to lend him $20,000 at ten per cent per annum for six months, with an option to extend payment for one year, and like extension of time in which to pay the $25,000 and interest then owing Steinfeld. That defendants' answer "avers that on or about the 2d day of July, 1910, and at the time of the execution of said contract of said date, the said Blaisdell was indebted to the said Steinfeld in the sum of $25,000. That at said time the said Steinfeld extended the time of payment of all of said indebtedness then due for the period of six months," taking notes therefor bearing ten per cent interest, payable monthly. This statement in the answer should be considered in connection with the contract which mentions "indebtedness now existing and the money now owing" from Blaisdell to Steinfeld.

A perusal of the July contract will convince anyone that the writer thereof was determined, at the expense of much repetition and great prolixity, fully and clearly to state the agreements as explained and detailed to him. There is no suggestion that the contract contains any stipulation, term, or obligation not intended or fully understood and agreed to. The preamble of the contract recites appellant's indebtedness to Merchants' National Bank and appellee Steinfeld, and then says: "And, whereas, the said Blaisdell is desirous of obtaining assistance from the said Steinfeld to pay said indebtedness unto the said bank, or a part thereof, and is further desirous of securing the said Steinfeld for any moneys he may now advance or loan for said purpose and is also desirous of further securing the said Steinfeld upon the indebtedness now existing and the money now owing, as well as the moneys hereafter to be owing by said Blaisdell unto the said Steinfeld, and the said Steinfeld is willing to assist the said Blaisdell in said matters, and upon the terms and

conditions hereinafter set forth: Now, therefore, in consideration of the sum of one dollar ($1.00), cash . . . and of the covenants and conditions hereinafter contained, and to be kept and performed.'' The ''terms,'' ''conditions,'' and ''covenants'' to be kept and performed then follow and are in short: That Steinfeld would pay to Merchants' National Bank $20,000 for Blaisdell's credit and endeavor to secure from bank an extension of six months from July 2, 1910, for Blaisdell to pay the balance owing the bank. Blaisdell was to give to Steinfeld his two ten per cent $10,000 notes secured by $50,000 par value bonds of Yuma Electric and Water Company. Steinfeld at his option could pay to Merchants' National Bank balance of $20,000 within four months, in which event Blaisdell was to execute his note to Steinfeld for amount bearing ten per cent and secure same with $50,000 par value bonds of Yuma Electric and Water Company. As further security for loans and forbearances, Blaisdell was to assign and transfer all equities and rights of his in any stocks and bonds of the Yuma Electric and Water Company and Yuma Gas Company and execute to Steinfeld a mortgage on his real property in Yuma county. Then follow the terms, prices, and conditions under which Blaisdell may sell or dispose of stocks, bonds, and real estate. Then follows the ''term,'' ''condition,'' or ''covenant'' in regard to Steinfeld's commission, which ''is to be kept and performed,'' and in consideration of which ''the said Steinfeld is willing to assist the said Blaisdell in said matter''; that is, lend him money at ten per cent upon security selected and approved by him.

The stipulation as to Steinfeld's commission is, in effect, that he shall have a commission of ten per cent upon the amount received for the properties of the Yuma Electric and Water Company and the real estate regardless of who shall make or negotiate the sale, to be paid at time of sale, and to be paid regardless of any indebtedness of Blaisdell to Steinfeld and however remote the sale is made from July 2, 1910, and also that sale shall be made through Steinfeld. In the event that sale is not made until after Blaisdell has discharged all his obligations to Steinfeld, then Blaisdell was to leave with Steinfeld sufficient securities to secure the payment of said commission when the sale or sales shall be made.

It seems to us that the contract has set forth in language most clear, explicit, and convincing that the so-called commission on sale of property was in part at least the moving consideration to Steinfeld to lend Blaisdell money and to grant extensions of time on money already owing. Under the contract this ten per cent was not for services to be rendered by Steinfeld, for he nowhere agreed to render any services in effecting a sale or for any other purpose. His obligation was discharged by lending the money and granting extension of time. Blaisdell's obligation was "kept and performed" on his part when he paid all that he owed, principal and interest, and ten per cent "commission" on sale price of his property. That the payment of the principal and interest was considered an incomplete discharge of his "covenants" is shown by the provision in the contract to the effect that, if the property was not sold before the satisfaction of his obligations, then and in that event security should be left with Steinfeld for commissions when sale was made.

Notwithstanding the clear meaning and import of the language used in the contract, defining Steinfeld's right to ten per cent commission, in his answer he states that the consideration for said commission was services already rendered and services to be rendered in the sale and disposition of the property, and in his answer insists that he had earned his commission by such services, even though no sale of the property had been made by him or anyone else, and insists on retaining security for commission in the face of a revocation of his authority to sell the property, an untenable position under the law as we have heretofore shown, but indicating that he not only at the time of the execution of the contract of July, but at the time of taking issue with plaintiff's cause of action, thought himself entitled by the terms of the contract to the stipulated commission. On March 4, 1912, Steinfeld wrote Blaisdell, "If you finally conclude not to negotiate a sale at the present time, on account of the conditions not being opportune, then I believe you ought to turn over to me the ten per cent interest in all your properties, and cancel that part of your contract existing between us"; and again on March 9, 1912, in reply to a letter of Blaisdell in which the latter said, "In regard to your commission of ten per cent for selling the property, I do not see how you can ask

for that until you have made a sale.'' Steinfeld said: ''With
reference to my commission, I shall expect of course that the
contract I hold with you and your company shall be lived
up to in letter and spirit. If you will remember, the object
of making this contract was to make a sale, whether I made
it, or you, or anybody else made it, and that in such an event
I was to receive the commission stipulated. You also remem-
ber what the consideration of this commission was, of my
extending to you an additional line of credit and extending
the time of payment of the remainder of the obligation.'' It
is true that Steinfeld in his oral testimony stated that he did
not expect any commission unless he was instrumental in
making a sale of the property, a position so at variance with
his answer filed in the case and with his letters above quoted
as not to be reconciled. By adopting the construction placed
upon the contract by appellee Steinfeld, as contained in his
letters, the terms of the contract are upheld. By adopting
the construction now contended for by appellees would be to
give the contract a meaning not to be found in its language,
but contrary and foreign to its language. The plain, clear,
and solemnly written and executed contract should prevail as
the measure of the rights of the contracting parties. The
contract then between appellee Steinfeld and appellant Blais-
dell was that Steinfeld would grant to Blaisdell an extension
of time for six months, with an option for one year, on the
$25,000 that Blaisdell owed Steinfeld on July 2, 1910, and
lend him $20,000 more for like time, for which Blaisdell
promised and agreed to pay ten per cent interest per annum
and ten per cent on the sale price (estimated at $200,000 to
$250,000) of property pledged as security whenever sold,
either during life of loan, or afterward, and regardless by
whom sold. It is clear that Blaisdell here agreed to pay
more than twelve per cent per annum for the use of the
$45,000. It remains to apply the law to such a contract.

Section 1, chapter 84, page 221, Laws of 1909, provides
that the legal rate of interest in Arizona, in the absence of
an agreement, shall be six per cent per annum, but that par-
ties may agree in writing to a different rate, not to exceed
twelve per cent per annum. Section 2, Id., is that ''any
person so contracting for a greater rate of interest than

twelve per cent per annum shall forfeit all interest so contracted for in excess of such twelve per cent. . . . "

"In deciding whether any given transaction is usurious or not, the courts will disregard the form which it may take and look only to the substance of the transaction in order to determine whether all the requisites of usury are present. These requisites are: (1) An unlawful intent; (2) the subject matter must be money or money's equivalent; (3) a loan or forbearance; (4) the sum loaned must be absolutely, not contingently, repayable; and (5) there must be an exaction for the use of the loan of something in excess of what is allowed by law. If all these requisites are found to be present, the transaction will be condemned as usurious, whatever form it may assume, and despite any disguise it may wear. But, if any one of these requisites is lacking, the transaction is not usurious, although it may bear the outward marks of usury." 39 Cyc. 918, 919.

As Lord MANSFIELD said in *Floyer* v. *Edwards,* Cowp. 112, 114, 98 Eng. Reprint, 995: "Where the real truth is a loan of money, the wit of man cannot find a shift to take it out of the statute."

The "unlawful intent" referred to is presumed "from the mere fact of intentionally doing what is forbidden by statute. It is not necessary that the parties shall know that in so doing they are violating the law." 39 Cyc. 920. "When, in addition to legal interest, the lender exacts of the borrower, as a condition of the loan, or forbearance, an additional sum, the loan is tainted with usury, which cannot be cloaked by calling the illegal exaction 'commission' or 'bonus,' or by any other euphemistic name." 39 Cyc. 971.

In *Weaver* v. *Burnett,* 110 Iowa, 567, 81 N. W. 771, the court quotes Chancellor WALWORTH in *Colton* v. *Dunham,* 2 Paige (N. Y.), 267, as follows: "Whenever, by the agreement of the parties, a premium or profit beyond the legal rate of interest, for a loan or advance of money, is, either directly or indirectly, secured to the lender, it is a violation of the statute, unless the loan or advance is attended with some contingent circumstances by which the principal is put in evident hazard. A contingency merely nominal, with little or no hazard to the principal of the money loaned or advanced, cannot alter the legal effect of the transaction.

. . . Where there is negotiation for a loan or advance of money, and the borrower agrees to return the amount advanced at all events, it is a contract of lending; . . . and whatever shape or disguise the transaction may assume, if a profit beyond the legal rate of interest is intended to be made out of the necessities or improvidence of the borrower, or otherwise, the contract is usurious.'' See, also, the following cases: *Scott* v. *Fabacher,* 176 Fed. 229, 100 C. C. A. 147; *Scott* v. *Lloyd,* 9 Pet. 418, 460, 9 L. Ed. 178; *Buttrick* v. *Harris,* 1 Biss. 442, Fed. Cas. No. 2256; *Inland Trading Co.* v. *Edgecombe,* 57 Wash. 257, 106 Pac. 768.

We think the contract of July 2, 1910, itself, and the evidence at the trial, conclusively show that the ten per cent of sale price of property provided for was a part of the consideration for loan of money and forbearance on money; that the so-called commission under the contract was to be paid at all events; and that the agreement to pay it was as certain as the promise to repay the principal indebtedness with interest, and that its payment under the contract was not contingent upon Steinfeld's effecting a sale of the properties, but was an unconditional promise to give Steinfeld ten per cent of the sale price of property whenever sold by Blaisdell or anyone else. It follows that the court erred in not finding, from the evidence, that. the contract to pay this additional ten per cent of the sale price of property to Steinfeld was usurious and void.

3. The contract of January 19, 1911, it is charged, by the next assignment, is affected with the same infirmities as the July contract. It is said that the court erred in not finding from the evidence that the consideration for the transfer of fifteen per cent of the bonds, stock, and real property to Steinfeld was a usurious consideration and void, and further in not finding that said contract was unconscionable.

The trial court found that appellant, in consideration of appellee Albert Steinfeld's becoming ''interested with plaintiff in his (plaintiff's) enterprise at Yuma, Ariz.,'' ''freely, and without collusion, duress, or compulsion of any kind, and for such consideration agreed to give, of his own voluntary offer,'' said fifteen per cent of bonds, stocks, and lands. ''That the real, true, and only consideration for the

transfer of said fifteen per cent of said bonds and stock and said lands . . . was the services of said defendant to be rendered by said defendant unto the plaintiff, and that the consideration therefor was not the loaning of money or the forbearance on money lent or extension of time. That the said defendant did thereafter render the services agreed on.'' That the contract of January 19, 1911, was not usurious. This finding supports the two theories set forth in appellees' answer: (1) That the fifteen per cent was a voluntary gift to Steinfeld in order to have him become identified with appellant in his Yuma enterprises; and (2) that the fifteen per cent was for aid, services, and assistance of Steinfeld to be rendered appellant. It is the contention of appellant that the evidence shows that the only consideration for the fifteen per cent of his property was the lending of money and extension of time on loans, as alleged in his complaint.

The evidence is that from July, 1910, to some time in November, 1910, both appellant and appellee Steinfeld were trying to find a buyer for the Yuma properties, and that they had been unsuccessful. That the main reason for offering the property for sale was to enable appellant to pay off his indebtedness to Steinfeld, Merchants' National Bank, and others, in all amounting to about $100,000. All this time the demands on the Yuma plants were increasing, and it was necessary that they be enlarged and improved to meet the demands. Blaisdell wanted financial assistance from appellee Steinfeld. These facts are gleaned from their letters to each other. On December 23, 1910, appellant went to Tucson for the purpose of borrowing more money from Steinfeld. Both testified as to what each said on this occasion and as to their agreement. They did not agree as to what took place, but Blaisdell left for Los Angeles with the understanding that Steinfeld would cause their agreement to be reduced to writing for their signatures. Steinfeld alone furnished the data of the contract to the lawyer who wrote two instruments that were satisfactory to Steinfeld, and he caused them to be sent to Blaisdell. One of these instruments was a bill of sale from Blaisdell to Steinfeld of fifteen per cent of the stock of the Yuma Electric and Water Company and the Yuma Gas Company, fifteen per cent of Blaisdell's bonds of said corporations; and fifteen per cent of all the real

estate owned by Blaisdell or Blaisdell and his wife in Yuma
county, Arizona. This bill of sale recited the consideration
for the transfer as follows: "That whereas the party of the
second part has rendered valuable services unto the party
of the first part, and for and on his behalf, and for his use
and benefit; and whereas, the party of the first part has
received other valuable consideration from the said party
of the second part; and whereas, the party of the first part
is desirous of obtaining the further services of the party
of the second part in and about certain of his business
enterprises."

The other instrument that Steinfeld caused to be drafted
as covering his and Blaisdell's oral agreement of December
23d, and which was sent to Blaisdell at the same time that
the above bill of sale was sent, provided for an extension
of time for two years from January 1, 1911, for the pay-
ment of the $45,000 then owing Steinfeld by Blaisdell and
for the loan to Blaisdell of $7,500. In fact it is in all ma-
terial ways the same instrument as the one dated January
19, 1911, found in statement of case, except that it did not
provide that Steinfeld should take up the $20,000 Blaisdell
owed the Merchants' National Bank, as does the contract of
January 19th.

The two instruments sent to Blaisdell were never executed
for the reason that they were not satisfactory to Blaisdell.
They may be taken, however, as a true and correct reflex
of Steinfeld's understanding of the verbal agreement between
them on December 23d, for they were drawn upon data
furnished the draftsman by him.

The preamble to the bill of sale sent Blaisdell recites the
consideration for the fifteen per cent of appellant's prop-
erty to be "valuable services" already rendered and "fur-
ther services" to be rendered Blaisdell "in and about certain
of his business enterprises." This recital does not support
the idea that Blaisdell was voluntarily giving this property,
as was found by the court. The property was to be turned
over to him for "services" rendered and to be rendered.
The attorney who drew these instruments knew nothing of
this transaction until he was told of it by Steinfeld, and in
drawing them it may be assumed that he followed the in-
structions of Steinfeld. On January 19, 1911, Blaisdell went

to Tucson and again took up the matter of their agreement which was begun on December 23d. After agreeing between themselves as to the terms of their contract, they went to the offices of Mr. S. L. Kingan, an attorney, for the purpose of having him reduce it to writing.

We will use Mr. Steinfeld's testimony as to what was said and done after arriving at Mr. Kingan's office:

"Mr. Blaisdell came to Tucson. He did not execute the agreements which I had mailed to him. He said there was an objection to it on account of the provision of an indebtedness which was provided for there, and we discussed the matter somewhat. This was in the store in my office. And he also stated that the fifteen per cent which he had agreed to give me was intended by him to cover—to cover the amount of the commission contract, and not as a separate gift of the bonds, of the interest at that time. I said that was not the understanding, nor was it the agreement, because the contract, commission contract, had no bearing whatsoever on this and was not discussed at that time and that I would not accept that. He apparently was satisfied, said that he did not understand it that way, but was satisfied to go ahead with it, and we after—and from my office we went to Mr. Kingan's office to prepare the papers. He came up here for that purpose. We went to Mr. Kingan's office and told. Mr. Kingan what we had agreed to, and Mr. Blaisdell again said that he thought I ought to cancel the contract of—commission contract, which I again refused to do. Then Mr. Blaisdell said, 'Well, now, you obligate yourself to pay that other $20,000 I still owe the Merchants' National Bank of Los Angeles?' And after thinking the matter over a little while, I said: 'Yes, I will; I will do that.' After I had agreed to pay this debt of the Merchants' National Bank, Mr. Kingan then said, 'Now, it seems to me that this contract that you, gentlemen, want to draw up here might be considered usury.' And that led on to the matter about Mr. Blaisdell wanting—suggested (no, I think I suggested; I don't remember who suggested)—that these securities which I was holding of Mr. Blaisdell's, consisting of a lot, those that are enumerated here in this trial here, should be returned to him, to which I agreed. Up to that time I wish to state—up to that time we had reached Mr. Kingan's office,

no mention whatsoever—no intimation had ever been made or nothing has been discussed or talked about usury, or any form of usury, in connection with it. It was a perfectly plain transaction of its kind at that time. I had no idea that there was any usury in it. Mr. Kingan first suggested the usury. I asked Mr. Kingan why it was usury, and he said he did not know it was usury, but it might be considered so. And then I suggested that perhaps these securities, if they were returned to him, asked him whether that would be considered—would modify it in any way; and he seemed to think that that was all right. That was all that was said in that morning conversation. I saw Mr. Blaisdell again that day, in the afternoon, in Mr. Kingan's office. We went to Mr. Kingan's office—that was rather late in the afternoon—to see whether the papers were ready and to execute them. Mr. Kingan has the papers prepared and Mr. Kingan again suggested that he was not entirely satisfied with the contract; that it was—that it might be considered usurious. And I asked him why. And he says, 'Now, you are returning these papers, which there seems to be some— some lack of consideration here for this.' Then I said to him, I says, 'But I am rendering services here for this fifteen per cent which Mr. Blaisdell is giving me.' And then Mr. Blaisdell said, 'Yes, Mr. Steinfeld is to render me services; he has become identified with me; I want him with me, associated with me, and for that I am giving him this fifteen per cent.' Mr. Kingan said, 'Well, now, if that is so, that is different here, and I will reconstruct this contract.' Mr. Blaisdell at that time was very anxious to get away on that day, and he says, 'Well, now, I am very anxious'— asked him how long it would take him to do that. He said it was late in the afternoon, and he couldn't get through with that in time. And Mr. Blaisdell was very anxious to get away, and he says, 'Well, now, Mr. Steinfeld and myself have known each other for a great number of years, and there will never be any such question raised, if there is such a thing to be raised; and we understand each other, and this is the understanding.' And Mr. Kingan said, 'Well, now, if Mr. Steinfeld is satisfied, we can always prove the real consideration in this matter.' And the contract was then executed at that time as it was then prepared. Q. Well,

then, state what was the consideration for the transfer of the fifteen per cent to you? A. The services which I was to render Mr. Blaisdell then, and which I did render him.''

Mr. Kingan's statement as to what was said and done in his office is as follows: ''Mr. Blaisdell and Mr. Steinfeld came to my office on or about January 19, 1911, in the morning, I should judge about 9:30. They came together. I was requested to draw a contract. It is rather difficult for me to state just who said this and who said that. I can simply tell you what took place there, as near as I can remember it. They both came into the office, and Mr. Steinfeld, as I now remember, said that they desired a contract. He and Mr. Blaisdell desired a contract drawn; and they gave me the data. Let me have one of those contracts, please. (Counsel hands paper to witness.) I think Mr. Steinfeld gave me the information which I am going to state: . . . That Mr. Blaisdell owed Mr. Steinfeld, as I remember it, $45,000, of which $25,000 he had owed him from the 2d of July, 1910, and $20,000 for money which he had paid the Merchants' National Bank of Los Angeles under the contract of July 2, 1910; that the time of payment of that money was to be extended until the 1st day of January, 1913; that Mr. Steinfeld was to loan Mr. Blaisdell $7,500, and Mr. Blaisdell was to advance a like amount and was to loan the total sum of $15,000 to the Yuma Electric and Water Company, and Mr. Blaisdell made certain representations about the indebtedness of the company; and that Mr. Blaisdell was to convey to Mr. Steinfeld fifteen per cent of the amount of the bonds of the Yuma Electric and Water Company, fifteen per cent of the gas bonds, and fifteen per cent of the real estate. I then said that the transaction struck me as usurious; that it appeared that Mr. Steinfeld was extending time of payment of certain money, loaning him other money, and getting fifteen per cent of this property, fifteen per cent of the bonds, and fifteen per cent of the stock, and fifteen per cent of the real estate. I said I didn't think a contract of that sort was either—I said illegal, or some such term as that. Mr. Steinfeld then said, 'What is the matter with it?' Mr. Blaisdell and Mr. Steinfeld were both there, sitting at my desk. 'Well,' I said, 'there is no consideration for this fifteen per cent.' Mr. Steinfeld then

said, 'Mr. Blaisdell wants me to release, or I will release to him, certain securities of Mr. Blaisdell's, which I now hold, namely, $21,000 note, or such an amount, of the Blaisdell Company, indorsed by Mr. Blaisdell, and that—and other securities. If I release those to Mr. Blaisdell will that be a good consideration?' And I said, 'Yes.' And I said, 'Send me down a list of those securities.' Mr. Blaisdell and Mr. Steinfeld then left the office, and in a little while Mr. Steinfeld sent me the list of securities which is released in that instrument. I then proceeded—Mr. Blaisdell, as I remember it, told me that he wanted to get away that day. I then proceeded to draw these contracts which bear the date of January 19th. As soon as I thought about the matter, I saw that what I had stated to Mr. Blaisdell and Mr. Steinfeld about the consideration was not correct, and the contract still appeared to be usurious; and I think, to the best of my recollection, or my recollection now is, that it is because I had that belief that I drew the instruments separately. I divided, of my own volition, the one proposition that both of them had given me, and put it in two instruments—these two instruments which are executed. I did that of my own volition, and I did that because I was under the impression and belief, after I thought over the matter, that it appeared to me to be a usurious contract. I drew those papers in the form that they now are—in the form that they are in the pleadings. After I drew them I had a further interview with Mr. Blaisdell, or Mr. Steinfeld. I didn't see either of them until (it must have been 4 or 4:30 o'clock in the afternoon) Mr. Blaisdell and Mr. Steinfeld came in together. They came in together in my back room, and I was sitting at the desk, and they sat down. Mr. Blaisdell sat in a chair at my right, between the desk and the wall, and Mr. Steinfeld sat directly in front of me, opposite me, across my large desk. I had the two contracts before me. I said to them, 'I am still not satisfied about these contracts.' Mr. Steinfeld said, 'What is the matter with them?' or words to that effect; and I said, 'Well, they strike me as usurious.' And Mr. Steinfeld again asked why, and I might have mentioned—I think I did say, 'Well, there is no consideration for this fifteen per cent.' Mr. Steinfeld then leaned across the table toward me and said, 'Oh, but

I am to render services for that fifteen per cent.' Mr. Blaisdell, sitting at my right, said, 'Yes, Mr. Steinfeld is to become identified with me in these various enterprises.' He used the words 'identified with me in these enterprises.' And I said, 'Why didn't you tell me this before?' And Mr. Steinfeld said, 'Oh, I don't know; I don't know why I didn't tell you'; and no satisfactory answer was made. And I said, 'Well, that being so, my doubts are removed. This is an entirely different proposition, and I want to redraw these instruments, to set forth the real situation.' Mr. Blaisdell then said, 'I don't want to stay over here another day; I want to catch this evening's train.' I don't know where he said he was going to, but I think to Los Angeles or Yuma. He said, 'Mr. Steinfeld and I are old friends; we will never have any trouble about this matter.' And I said, 'All right, go ahead and sign up these papers'; and the papers were then signed. . . . Mr. Blaisdell requested Mr. Steinfeld to relinquish the ten per cent commission under the contract of July 2, 1910, for the sale of the property. Mr. Steinfeld said, 'No, I won't relinquish that. I have done a lot of work in regard to the sale of the property. I have negotiations,' as I remember now, 'pending. I think I have earned that commission, and I won't give it up.' Mr. Blaisdell then said, 'Well, Mr. Steinfeld, will you absolutely agree to take care of the Merchants' Bank, the $20,000 that is still due the bank?' And Mr. Steinfeld said, after some hesitation, he says, 'Yes, I will do that; I will agree to pay that $20,000 absolutely when they call on me.' I overheard that. . . . There wasn't anything about a gift—nothing said about a gift, Mr. Hupp. What I testified to this morning was that Mr. Blaisdell asked Mr. Steinfeld to release the ten per cent commission. . . . I did not understand then that Mr. Blaisdell was making a present of this fifteen per cent for the purpose of securing Mr. Steinfeld's valuable presence in his company and helping him out. Mr. Steinfeld didn't state to me why Mr. Blaisdell was giving this fifteen per cent at that time. I cannot tell you what had been agreed upon before they came to the office."

It seems hardly necessary to enter upon an analysis of the above testimony for the purpose of ascertaining its meaning. The witnesses purport to detail what took place at

the last meeting of the contracting parties between whom negotiations had been pending from December 23, 1910, up to the date of conversation January 19, 1911, in which the subject matter of the transaction was loan of money and extension of time by Steinfeld to Blaisdell, upon interest and security, and the transfer as a part of the same transaction by Blaisdell to Steinfeld of an interest agreed and settled in this meeting to be fifteen per cent of certain property of Blaisdell's. Part of the consideration of the transaction (the loan of money and extension of time by Steinfeld and transfer of property by Blaisdell) was that Steinfeld would obligate himself "to pay that other $20,000" that Blaisdell owed the Merchants' National Bank. This Steinfeld agreed to do. Until this promise was included in the contract, there had been no meeting of the minds of the contracting parties. Blaisdell until then had been insisting that he should transfer to Steinfeld but five per cent of his property, which, with the ten per cent of the July contract, would make the fifteen per cent; Steinfeld refusing the transfer of five per cent and insisting that the fifteen per cent was in addition to and independent of the ten per cent he was to receive under the July contract. Blaisdell made it a condition of the contract before acceding to Steinfeld's demand that the latter would agree unconditionally to take up the balance he then owed the Merchants' Bank, $20,000. Up to this time there were only negotiations. Their dealings became a binding contract when their minds came together in harmonious agreement. That Steinfeld's agreement to take care of Blaisdell's indebtedness to the bank entered into the consideration of their contract is significantly emphasized by the absence of any mention thereof in the draft of the contract that Steinfeld caused to be drawn and sent to Blaisdell covering their negotiations at their first meeting of December 23, 1910. This item first appears in their last meeting in Mr. Kingan's office January 19, 1911, and is specifically set forth in the contract of that date as one of the "covenants and conditions" thereof.

The two instruments of January 19th were not two contracts. They were but one contract. As Mr. Kingan says: "I divided, of my own volition, the one proposition that both of them had given me." Any consideration in either was a

consideration for the other. They must stand or fall together. The recited consideration (the releasing to Blaisdell of certain of his stocks and bonds and a note held by Steinfeld) in the instrument transferring the fifteen per cent of Blaisdell's property was not relied upon in the court below, nor in the presentation to this court, as a sufficient or any consideration for such interest.

There is no substantial evidence to support the court's finding that this fifteen per cent of Blaisdell's property was a voluntary gift. Kingan says he heard no mention of its being a gift by either of the parties. The value of the fifteen per cent of Blaisdell's property was $37,500, and five per cent would be $12,500. We submit that it seems to us a contradiction in human nature to refuse a free-will offering of $12,500, for Steinfeld says, "I would not accept that"; and it likewise imposes on our experience and observation to believe that the almoner, upon the rejection of the offer, would without some valuable consideration or impelling motive yield to a demand of three times the offer. Steinfeld himself testified that it was not a gift. Neither is the finding that the fifteen per cent of Blaisdell's property was transferred to Steinfeld for services supported by any substantial evidence.

Steinfeld probably believed he was stating the truth when he testified that the consideration for the transfer of the fifteen per cent of Blaisdell's property was for services independent of loaning money and extending the time of payment of loans. But this was only his construction of the contract. The facts that he and his witness Kingan detail, and other evidences, show that his conclusion was erroneous. Where a transaction involves many propositions dependent upon each other, the lay mind might not unreasonably, for the purpose of an emergency such as exists in this case, undertake to segregate each proposition into separate contracts. However, the law will not permit this. The "services," as pleaded in the answer and as testified to by Steinfeld, in the broad general sense in which it was used, would cover all aid or assistance one might be able to render another. It might mean a thousand things.

On his cross-examination Steinfeld was asked about the services that he had rendered to Blaisdell for the fifteen per cent of the latter's property as follows: "Q. Now, what ser-

vices did you render to Mr. Blaisdell in consideration of that fifteen per cent during the balance of that month of December? A. I don't remember. Q. Did you perform any? A. Well, I can't remember just what all happened there. Q. Now, what services during the month of January, 1911, did you render Mr. Blaisdell in consideration of that fifteen per cent? A. Well, as I have said, it has been a continuous line of service; it is continuous work that I have given him along there. Q. Can you tell me anything that you did during the month of January, 1911? A. No, I can't tell you anything except in a general way. Q. In the month of February? A. These letters here, these would indicate something which I have been doing. Q. What did you do outside of going to Yuma for Blaisdell in consideration of that fifteen per cent?'' To the latter question Mr. Ives objected, and the objection was sustained by the court. Afterward Steinfeld did testify that he met a number of people in Tucson and Los Angeles and discussed with them Blaisdell's business affairs. The time he gave to Blaisdell's business did not interfere with the conducting of his own business. He made one trip to Yuma. The services rendered, therefore, were negligible and only such as a large lender would naturally bestow on the business enterprises of the borrower.

In discussing the evidence in the case, we have not referred to Blaisdell's version of the transaction that resulted in the execution of the two instruments of January 19, 1911. While his testimony supports the complaint and is to the effect that Steinfeld exacted and demanded the transfer to him of fifteen per cent of his property, before making the loan and granting extension of time and agreeing to take up the $20,000 still owing the Merchants' National Bank, we feel justified in relying upon the instruments executed, and the testimony in behalf of appellees in arriving at the conclusion that the January contract was usurious and void.

Under the January contract the lender was to be repaid every dollar that he had loaned or should advance, together with ten per cent per annum payable monthly. In addition thereto he was paid or given as a bonus fifteen per cent of certain of appellant's property amounting in money to some $37,000. The twelve per cent allowed by law was exceeded. As heretofore stated, the appellant had repaid to

appellee Albert Steinfeld all of his indebtedness, together with ten per cent interest thereon as agreed, before bringing this action.

The relief asked by appellant in his complaint under the agreements of July 2, 1910, and January 19, 1911, and all the instruments made and executed thereunder concerning the ten per cent commission and the fifteen per cent transfer of his property to Steinfeld, his trustees Harold Steinfeld and F. R. Pauli, is that they be declared null and void; that his stock and bonds be ordered returned to him, or their value, and for $2,137.50, being the amount of interest paid Steinfeld upon the bonds held by him; that defendant Harold Steinfeld be ordered to redeed to him the fifteen per cent of lands; that F. R. Pauli be ordered to reassign to him the 150 shares of stock of the Yuma Electric and Water Company; and for general relief and costs.

The judgment of the trial court should have been that Steinfeld return to appellant the stocks and bonds held by him as security for claim of commission under the July contract, as under the facts he had earned no commission and was entitled to no commission by virtue of that contract.

It is well settled at common law that where usurious interest has been paid by the borrower to the lender, as was done under the January contract, he may recover the excess over the rate the parties are authorized by law to contract for. In such case the payments are not deemed voluntary, nor is the debtor regarded as being *in pari delicto* in making them. 39 Cyc. 1030.

"Equitable relief is granted against usurious contracts, whether executory or executed, since from considerations of public policy the two parties are not regarded as standing *in pari delicto*. . . . If the contract is executory, the borrower may obtain the remedy of a surrender and cancellation of the securities which he has given for the usurious loan. If the contract is executed, he may recover back the usurious amount paid in excess of the sum actually borrowed, and legal interest thereon. . . . " 2 Pomeroy's Equity Jurisprudence, 3d ed., par. 937.

The note to *Baum* v. *Thoms,* 65 Am. St. Rep. 368 (150 Ind. 378, 50 N. E. 357), reads as follows: "Payment of usurious interest is regarded as made under moral duress and is there-

fore excepted from the operation of the ordinary rule that voluntarily paying an illegal claim estops the payor from maintaining an action to recover such payment. Note to *Bexar Building etc. Assn.* v. *Robinson*, 22 Am. St. Rep. 41. One who has paid more than the legal rate of interest may recover the excess in an action of *assumpsit* and is not limited to the remedy prescribed by the statute to prevent usury. But, to entitle the plaintiff to recover, he must show that he has done all that equity requires. *Wheaton* v. *Hibbard*, 20 Johns. [N. Y.] 290, 11 Am. Dec. 284; *Musselman* v. *McElhenny*, 23 Ind. 4, 85 Am. Dec. 445; monographic note to *Davis* v. *Garr*, 55 Am. Dec. 399, 400. Compare *Ferguson* v. *Soden*, 111 Mo. 208 [19 S. W. 727], 33 Am. St. Rep. 512.''

Equity will cancel deeds and encumbrances on real property if tainted with usury or given for a usurious consideration. *Davisson* v. *Smith*, 60 W. Va. 413, 55 S. E. 466, 470; *Scott* v. *Fabacher*, 176 Fed. 229, 100 C. C. A. 147.

The trial court should have given judgment to appellant for a return of all property paid over or given to Albert Steinfeld under the fifteen per cent contract of January 19, 1911, and directed Harold Steinfeld to deed back to appellant fifteen hundredths of the lands and premises deeded to him as trustee of Albert Steinfeld under said January contract, and ordered F. R. Pauli to transfer or reassign the 150 shares of the capital stock of the Yuma Electric and Water Company, and given appellant judgment for whatever interest that had been paid Steinfeld on bonds held by him.

Judgment is reversed and case remanded, with direction to enter judgment for appellant in accordance with this opinion.

FRANKLIN, C. J., and CUNNINGHAM, J., concur.

Application for rehearing denied.